99 F.3d 1529
 96 Cal. Daily Op. Serv. 8230, 96 Daily Journal
D.A.R. 13,703
Indiana Francisca GUTIERREZ-CENTENO; David Enrique
Morales-Gutierrez; Maria J. Morales-Gutierrez, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 95-70068.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1996.
Decided Nov. 14, 1996.
 
 Suzanne B. Friedman and Thomas L. Hiester, San Francisco, CA, for petitioners.
 Karen Fletcher Tortenson and Philemina McNeill Jones and April Gordon Dawson, Office of Immigration Litigation, Department of Justice, Washington, DC, for respondent.
 Petition for Review of a Decision of the Board of Immigration Appeals. I & NS Nos. Afm-yle-azz, Aub-xgn-mfp and Axc-ooi-yeh.
 Before: REINHARDT and HALL, Circuit Judges, and MERHIGE, District Judge.*
 Opinion by Judge REINHARDT; Concurrence by Judge HALL.
 REINHARDT, Circuit Judge:
 
 
 1
 Petitioners, Indiana Gutierrez-Centeno (Gutierrez) and her two children, David and Maria (David and Maria), appeal the decision of the Board of Immigration Appeals (BIA or Board) denying Gutierrez's application for asylum and withholding of deportation under §§ 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h), and their motion to reopen to apply for suspension of deportation under § 244(a)(1) of the INA, 8 U.S.C. 1254(a)(1). We deny review in part and grant in part.
 
 I. ASYLUM AND WITHHOLDING OF DEPORTATION
 
 2
 We deny review of the decision of the BIA rejecting the petitioners' requests for asylum and withholding of deportation.[1] At the deportation hearing, Gutierrez, a native and citizen of Nicaragua, testified to the following. Her family was well-connected to the Somoza government, as was the family of her husband. She participated in the Somocista Liberal Youth and earned several scholarships based on her association with Somoza's Liberal Party. After the Sandinistas came into power, they arrested and imprisoned one of her uncles, confiscated the property of other family members, and killed one of her husband's uncles. Her husband later abandoned the family, fearing that he too would be persecuted.[2] In 1985, due to her refusals to participate in Sandinista Defense Committee activities, the Sandinistas reduced her food ration card, and demoted her and forced her to resign from her job. She later learned, through a letter sent to her former employers, that the Sandinistas maintained a file which characterized her as untrustworthy. She fears returning to Nicaragua, notwithstanding the change in government, because the Sandinistas remain in control of the state security and police forces.
 
 
 3
 Based on this testimony, the BIA found that Gutierrez had neither established past persecution nor a well-founded fear of future persecution. Although we do not find Gutierrez's claim to be without substantial support, we cannot conclude that the evidence presented was so compelling that a reasonable factfinder would have to conclude that she established a well-founded fear of persecution. Accordingly, we deny review of the part of the petition that relates to the request for asylum and withholding of deportation. See INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992).
 
 
 4
 II. MOTION TO REOPEN/SUSPENSION OF DEPORTATION
 
 
 5
 While the appeal of the denial of asylum and withholding of deportation was pending before the BIA, the petitioners became eligible for suspension of deportation, as they had been continuously present in the United States for seven years. Accordingly, they filed a motion to reopen deportation proceedings to apply for such relief.[3] The BIA denied the motion.
 
 
 6
 We review BIA denials of motions to reopen for an abuse of discretion. Watkins v. INS, 63 F.3d 844, 847 (9th Cir.1995). We have held that the BIA abuses its discretion when it fails to offer a reasoned explanation for its decision, id. at 849-50, or "distorts or disregards important aspects of the alien's claim," see id. at 848 (citation and internal quotation marks omitted).
 
 
 7
 The BIA may deny a motion to reopen on any of three independent grounds: (1) failure to establish a prima facie case of eligibility for the relief sought; (2) failure to introduce previously unavailable, material evidence; (3) a determination that even if these requirements were met, the movant would not be entitled to the discretionary grant of relief sought. Id. at 847 (quoting INS v. Doherty, 502 U.S. 314, 323, 112 S.Ct. 719, 724-25, 116 L.Ed.2d 823 (1992)).
 
 
 8
 Here, the BIA determined that the petitioners failed to establish a prima facie case of eligibility for suspension of deportation.[4] To receive suspension of deportation, the petitioners had to establish: (1) continuous physical presence in the United States for seven years preceding the filing of the application; (2) good moral character during such period; and (3) that deportation will result in extreme hardship. 8 U.S.C. § 1254(a)(1) (1995).[5]
 
 
 9
 The BIA concluded in cursory fashion that the petitioners failed to establish a prima facie case because they did not establish extreme hardship. It based its decision on the following findings: (1) "[t]he respondents have not shown that because they have resided in this country since June 1986, they would be unable to readjust to living conditions in Nicaragua"; (2) "they have not shown any unusual community ties in the United States"; (3) "[t]he respondents have not shown that they would be unable to obtain employment or continue their education in Nicaragua"; (4) "the adult female respondent's father resides in Nicaragua"; and (5) the "adult female respondent reports that she has a brother who is a lawful permanent resident, indicating the potential, at least, for eventually other means of adjusting her status."[6]
 
 
 10
 The BIA abused its discretion in finding that petitioners had not established extreme hardship. First, it failed to consider the merits of each petitioner's application individually. See Jara-Navarrette v. INS, 813 F.2d 1340, 1343 (9th Cir.1987) (finding that the BIA abused its discretion by abdicating its "responsibility to make [an] individualized evaluation of the petitioner's ... circumstances"). Its opinion reads as if it saw no distinction whatsoever among the petitioners or their applications. Its failure to make an individualized evaluation of the merits of the applications is underscored by the repeated references to the "respondents." Indeed, only the passing reference to the ability to continue their educations evidences any recognition of David and Maria's individual circumstances or applications.[7]
 
 
 11
 Next, the BIA abused its discretion by failing to show proper consideration of all relevant factors. See Hassan v. INS, 927 F.2d 465, 467 (9th Cir.1991) (stating that the BIA is required to show proper consideration of all factors when weighing equities and denying relief).[8] The BIA disregarded several factors relevant to Gutierrez's application. It ignored her family ties in the United States and the hardship that would result from her separation from relatives living in the United States. Gutierrez testified at the deportation hearing that her only family, her brother and the aunt who raised her, live in the this country. The BIA erred in failing to consider this factor, which warrants considerable, if not predominant, weight. See Contreras-Buenfil v. INS, 712 F.2d 401, 403 (9th Cir.1983) ("We have held '[t]he most important single [hardship] factor may be the separation of the alien from family living in the United States.' ") (citation omitted); Ramirez-Gonzalez v. INS, 695 F.2d 1208, 1211 (9th Cir.1983).
 
 
 12
 The BIA compounded the error of not addressing Gutierrez's family ties in the United States by erroneously according weight to nonexistent family ties in Nicaragua. Although it is true, as the BIA opinion states, that Gutierrez's father lives in Nicaragua, he neither raised Gutierrez nor has he ever lived with her. Gutierrez's deportation will therefore not only sever close family ties, but return her to a country in which she has no real ties. This is not "the type of hardship experienced by most aliens who have spent time abroad." See Ramirez-Durazo v. INS, 794 F.2d 491, 498 (9th Cir.1986) (concluding that difficulty adjusting to life in homeland was type of hardship experienced by most aliens who have lived abroad, and noting that hardship would be alleviated by numerous relatives living in homeland).
 
 
 13
 The BIA also failed to consider the hardship that Gutierrez would experience given existing political and economic conditions in Nicaragua. Although economic detriment alone does not establish extreme hardship, it is nonetheless a factor to be considered in determining eligibility for suspension of deportation. Mejia-Carrillo v. INS, 656 F.2d 520, 522 (9th Cir.1981); In re O-J-O, 1996 WL 393504, at 5 (BIA June 14, 1996) (citing Mejia-Carrillo, 656 F.2d at 522).[9] That Gutierrez, a single mother supporting two children, would be returning to a country that was emerging from years of civil war and experiencing devastatingly high levels of inflation, unemployment and poverty, therefore, is a factor that the BIA should have considered.[10] Although we could not conclude that the BIA erred in finding that Gutierrez did not establish a well-founded fear of persecution, this does not mean that the BIA should not have considered the political situation in Nicaragua in assessing the hardship Gutierrez would suffer if deported. Gutierrez and her family have had a history of conflict with the Sandinistas. In light of the political instability in Nicaragua and the power which the Sandinistas continued to wield after the election of the Chamorro government, the political situation in Nicaragua is also a factor that should have been considered. See In re O-J-O, 1996 WL 393504, at 5 ("In light of the respondent's family's history of conflict with the Sandinistas, the current political situation in Nicaragua should be factored into the hardship assessment.").
 
 
 14
 Finally, with respect to Gutierrez, the BIA did not address whether she has been of special assistance to the community. Under BIA precedent, special assistance to the community is a relevant factor for suspension of deportation. In re Anderson, 16 I. & N. Dec. 596, 597-98 (BIA 1978). The record demonstrates that Gutierrez, having acquired special training relating to the care of AIDS and Alzheimer's patients, as well as the developmentally disabled, has worked as a nurse's aid since 1989. The work she has done on behalf of these persons in need of special care merits the most serious consideration.
 
 
 15
 With respect to David and Maria's applications, as mentioned earlier, in discussing their circumstances the BIA said only that they had not established an inability to continue their educations.[11] This does not constitute an individual assessment of the hardship they would suffer if deported to Nicaragua. First, David and Maria like their mother would suffer from the severing of close family ties with relatives in the United States. Second, again like their mother, they would experience economic detriment and political instability if deported to Nicaragua. The BIA must assess these factors in considering their applications.
 
 
 16
 Furthermore, the BIA did not specifically address the contention that David and Maria would experience difficulty adjusting to life in Nicaragua, specifically in terms of their educations. For both, English is their primary language.[12] In fact, Maria, who entered the United States when she was approximately in the third grade and who was in the tenth grade at the time motion to reopen was filed, can barely read or write in Spanish. The BIA failed to address whether Maria--or her brother--would suffer extreme hardship if deported given their limited Spanish proficiency and the advanced stages of their educations. See Ramirez-Durazo, 794 F.2d at 498 (noting that "[t]he fact that the Ramirez-Durazo family has been speaking Spanish in the home will ease the children's transition into Mexican society and schools"). The BIA's cursory statement that neither child would be unable to continue his education is insufficient. See Jara-Navarrette, 813 F.2d at 1342-43 (reversing BIA decision because conclusion that the three children were young and should be able to adapt successfully was "cursory and generalized").
 
 
 17
 Because the BIA abused its discretion in denying the motion to reopen, we must remand. Remand is particularly appropriate in light of the BIA's recent decision in In re O-J-O. In O-J-O, the Board granted suspension of deportation to a 24-year-old petitioner who, among other things, had lived in the United States since he was thirteen, completed his education in this country, fully integrated himself into American society, and if deported, would return to Nicaragua, where economic and political conditions were difficult. David and Maria both evidence a significant degree of integration into American society. Like the petitioner in O-J-O, they are both fluent in English. According to the motion to reopen and the accompanying documentation, David, who has won several academic awards, completed middle and high school in this country and now attends college in San Francisco. He participates in church activities and various team sports. Maria, who has been educated almost exclusively in this country, is now in high-school and is an honor student. She participates in church activities, serves as a member of the Junior Reserves Officer's Training Corps, and hopes to enroll in officer training upon graduation.
 
 
 18
 On remand, the BIA must review each petitioner's application individually and show proper consideration of all relevant factors. In determining whether a petitioner has made a prima facie showing of extreme hardship has been made, the BIA must consider the total cumulative effect on that petitioner of all the relevant factors. See In re Ige, 20 I. & N. 880, 882 (BIA 1994) ("Relevant factors, though not extreme in themselves, must be considered in the aggregate in determining whether extreme hardship exists."). In considering Gutierrez's application for suspension of deportation, the BIA must consider whether either of her children is independently entitled to suspension of deportation, because Gutierrez would undoubtedly suffer even greater hardship if involuntarily separated from either or both of them. Similarly, of course, if the BIA finds that Gutierrez is independently eligible for suspension of deportation, it must take that fact into account in evaluating the individual cases of her children.
 
 
 19
 For the reasons discussed above, we conclude that the BIA abused its discretion in denying the petitioners' motion to reopen. Accordingly, we grant review of that part of the petition and remand to the BIA for consideration of the motion in accordance with the law as explicated in this opinion.
 
 CONCLUSION
 
 20
 To the extent that the petition relates to the request for asylum and withholding of deportation, review is DENIED; to the extent that it relates to the motion to reopen, review is GRANTED.
 
 
 21
 VACATED in part and REMANDED for further proceedings consistent with this opinion.
 
 
 22
 CYNTHIA HOLCOMB HALL, Circuit Judge, concurring in the result:
 
 
 23
 I concur in Part I, denying review of the request for asylum and withholding of deportation because the Board's decision that petitioners failed to establish either past persecution or a well founded fear of future persecution was supported by the record. See INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992).
 
 
 24
 Although I disagree with the majority's approach and reasoning in Part II, I agree that the motion to reopen should be remanded to the BIA. I therefore concur only in the result.
 
 
 25
 We review a BIA decision denying a motion to reopen for abuse of discretion. Hassan v. INS, 927 F.2d 465, 467 (9th Cir.1991). The Board may deny a petitioner's motion if it finds that the petitioner does not establish extreme hardship. Id. The Board has discretion to construe extreme hardship narrowly. INS v. Wang, 450 U.S. 139, 145, 101 S.Ct. 1027, 1031-32, 67 L.Ed.2d 123 (1981). However, our decisions require the Board to state reasons for its decision and to properly consider all relevant factors. See, e.g., Hassan, 927 F.2d at 467-68.
 
 
 26
 Here, the Board's reasoning was general and conclusory. The Board did not mention petitioner's community ties to the United States. The son (David) has started college here; the mother (Gutierrez) is involved in community-oriented health care and church activities. Nor did the Board correctly consider family ties. See Contreras-Buenfil v. INS, 712 F.2d 401, 403 (9th Cir.1983). Gutierrez's aunt who raised her lives here, as does her brother. She has never lived with her father, who lives in Nicaragua, and she does not know the whereabouts of her Nicaraguan husband. Finally, the Board did not address the impact of deportation on the children.
 
 
 27
 The motion to reopen should be remanded because the Board abused its discretion. On remand, the Board must consider each application individually and must consider all relevant factors.
 
 
 28
 This Court, however, should not attempt to dictate the outcome of the Board's consideration of extreme hardship factors. To do so would "encroach[ ] on the authority which the Act confers on the Attorney General and his [or her] delegates." Wang, 450 U.S. at 144, 101 S.Ct. at 1031. The majority, however, indulges itself in an extended discussion as to how it might weigh various factors, concluding that Ms. Gutierrez's hardship "is not 'the type of hardship experienced by most aliens....' " Such surplusage is indicative of the majority's attempt to overstep its bounds. The majority not only articulates factors for the Board to consider, but also attempts to dictate to the Board how it should weigh the factors, instructing the BIA to consider the merits of petitioners' motion "as explicated" in its opinion. To the extent the majority opinion purports to resolve the ultimate finding of "extreme hardship," however, it is dicta.
 
 
 29
 The decision today does not hold that anything in petitioners' applications requires a finding of extreme hardship. To the extent the petitioners cite economic difficulties to themselves should they return to Nicaragua, this is not enough to distinguish them from all other Nicaraguans required to return to their country. See Wang, 450 U.S. at 144, 101 S.Ct. at 1031; Shooshtary v. INS, 39 F.3d 1049, 1051 (9th Cir.1994) (no "extreme hardship" arising from "generalities about having to move [petitioner's] family elsewhere, anticipated difficulties in finding work, and anticipated loss of friends"). Likewise, the mere fact that the children have lived in the United States for their formative years, and are not culturally Nicaraguan, does not compel a finding in their favor. See Ramirez-Durazo v. INS, 794 F.2d 491, 498 (9th Cir.1986); Shooshtary, 39 F.3d at 1051.
 
 
 30
 Furthermore, the majority's suggestion that hardship arises from the political climate in Nicaragua is both irrelevant and inaccurate. The majority states that the Board should have considered that, if deported, the petitioners would return to a country "emerging from years of civil war and experiencing devastatingly high levels of inflation, unemployment and poverty," and notes that "petitioners submitted various newspaper articles describing the economic crisis in Nicaragua."
 
 
 31
 To begin with, the current relevance of the newspaper articles and the January 1995 profile of Nicaragua cited to in footnote 10 is speculative at best, especially in light of the recent election in Nicaragua, which signals an improving economic and political climate. See, e.g., Larry Rohter, Rightist is Victor Over Sandanistas in Nicaragua Vote, N.Y. Times, Oct. 22, 1996, at A1 (Nicaragua moving towards free enterprise and closer U.S. ties).
 
 
 32
 More importantly, no authority requires the BIA to look at the general economic and political climate of an applicant's homeland to determine extreme hardship. The cases the majority cites accord little weight to the general economic and political climate of an applicant's homeland and do not require the Board to accord any weight to these general conditions.
 
 
 33
 Despite the majority's implication to the contrary, In re O-J-O, 1996 WL 393504 (BIA June 14, 1996), does not hold that generalized economic conditions in Nicaragua should be a factor in determining hardship. As the majority points out in footnote 10, the O-J-O Board did take note of the conditions in Nicaragua; however, the Board declined to accord them significance, specifically stating that these factors are "somewhat speculative." 1996 WL 393504 at * 5. Instead, the O-J-O decision was based on the particularized economic detriment to the petitioner in that case, who would lose the family business his father started in the United States if he were deported. Id. at * 5. (petitioner's "loss of income as well as the business good will" considered).
 
 
 34
 Similarly, In re Anderson, 16 I & N 596 (BIA 1978) does not hold that conditions in an alien's homeland are decisive in determining hardship. In Anderson, the Board cautioned against "laying critical emphasis on the economic and political situation" in an alien's homeland, even though such situations may be relevant. 16 I & N at 598. The Anderson decision denied suspension of deportation and found that Congress did not intend to suspend deportation of every alien experiencing "some degree" of hardship. Id. The Board concluded that, despite the political and economic climate in the petitioner's homeland, there was not "a sufficient number of other adverse factors" to find the necessary hardship. Id.
 
 
 35
 Likewise, Mejia-Carrillo v. INS, 656 F.2d 520 (9th Cir.1981) does not support the majority's proposition that economic conditions in Nicaragua should be considered. The Mejia-Carrillo court discussed economic detriment in terms of the petitioner's personal financial hardships, such as losing her job, and does not mention the general economic conditions in the petitioner's homeland. Id. at 522.
 
 
 36
 Thus, the cases cited by the majority stand for nothing more than the proposition that a petitioner's individual circumstances must be taken into account when determining whether extreme hardship exists. The majority opinion must be read in this context, as it cites no precedent supporting any broader proposition.
 
 
 37
 Finally, the majority's statement that remand is "particularly appropriate in light of the BIA's recent decision in In re O-J-O " is somewhat curious. O-J-O was a fact specific holding that did not create any new legal propositions. The decision was clear that "... the 'elements required to establish extreme hardship are dependant upon the facts and circumstances peculiar to each case.' " 1996 WL at * 3 (citation omitted). See also Id. at * 7 ("I am not deciding that all or most Nicaraguans would qualify for suspension of deportation."); Id. at * 8 ("... each suspension of deportation case must be resolved on its own facts and evidence."); Id. at * 17 ("In assessing 'extreme' hardship, our point of reference is the individual....").
 
 
 38
 The O-J-O decision is not new law, but merely a "close case" under existing law. Id. at * 6. There were three separate concurrences emphasizing this point, noting that the decision is "probably close to, if not already at, the outer limit," id. at * 7, and is "the furthest reaches" of an extreme hardship finding. Id. at * 8.[1] Therefore, O-J-O is instructive as an outer boundary of facts that will establish extreme hardship; it is not the springboard from which the majority might wish this court to leap in the future. The O-J-O Board itself did not intend the decision to create novel precedent. See id. at * 7 ("I do not see this decision as any departure from past Board precedents.") The majority's implications that it does are disingenuous, and the majority's reliance on In re O-J-O is wholly unnecessary to its conclusion to remand the motion to the Board.
 
 
 39
 In conclusion, the motion to reopen should be remanded to the Board to give the petitioners individual consideration of each of their claims for extreme hardship.
 
 
 40
 Although this court may require the Board to consider all relevant factors and to articulate its reasoning, the law is clear that we may not dictate the Board's results. Whether or not to grant a motion to reopen is "entirely" within the Board's discretion. INS v. Phinpathya, 464 U.S. 183, 188 n. 6, 104 S.Ct. 584, 588 n. 6, 78 L.Ed.2d 401 (1984); see also Wang, 450 U.S. at 143-44, 144 n. 5, 101 S.Ct. at 1030, 1030 n. 5; Ahwazi v. INS, 751 F.2d 1120, 1122 (9th Cir.1985); Hassan, 927 F.2d at 467-68. Because the majority does not claim to overrule the Supreme Court or previous decisions of this court, I read its decision today as doing nothing more than remanding to the Board, with instructions to carefully consider all relevant factors and to articulate reasons for its findings on "extreme hardship." Try though it might, the majority cannot eviscerate the requirement that a petitioner claiming extreme hardship must make "a showing of significant actual or potential injury." Shooshtary, 39 F.3d at 1051 (citation omitted). Any suggestions in the majority opinion that petitioners have actually established extreme hardship do not in any way bind the Board when it weighs appropriate extreme hardship factors on remand.
 
 
 
 *
 The Honorable Robert R. Merhige, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 David and Maria's claims to asylum and withholding of deportation are derivative of their mother's. See 8 U.S.C. § 1158(c) (stating that a child of an alien who is granted asylum may "be granted the same status as the alien if accompanying, or following to join, such alien")
 
 
 [2]
 In the early 1980s, state security forces questioned her regarding her husband. Gutierrez does not know her husband's current whereabouts
 
 
 [3]
 Motions to reopen filed while appeals to the BIA are pending are properly treated as motions to remand to the IJ. Rodriguez v. INS, 841 F.2d 865, 867 (9th Cir.1987). Despite the difference in nomenclature, the requirements governing the two motions are "for all practical purposes the same." Id. Because we rely on case law involving motions to reopen, we use that more common term throughout this section of the opinion when referring to the motion at issue
 
 
 [4]
 A Board member dissented from the denial of the motion to reopen. He "would not [have] den[ied] the respondents the opportunity to fully present their applications for suspension of deportation before an immigration judge."
 
 
 [5]
 The third requirement is that the deportation "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a)(1)
 
 
 [6]
 As to this last factor, the potential for other means of obtaining adjustment of status, we have found few cases citing it, let alone cases discussing how it should be assessed. However, we believe that unless there is a realistic chance for adjustment through other means in the near future, this factor should not weigh against an alien. Cf. In re Wong, I. & N. Dec. 271, 273 (BIA 1967 ) ("The Chinese quota to which the respondent is chargeable is greatly oversubscribed, and he could not obtain an immigrant visa. He could not adjust his status by other means than suspension of deportation. It is concluded that the respondent, if deported from the United States, would suffer extreme hardship."); In re Chien, 10 I. & N. Dec. 387, 388 (BIA 1963) (finding extreme hardship although respondent was the beneficiary of a visa petition; he could not "readily" obtain an immigrant visa to adjust his status because the relevant quota was oversubscribed). That an alien may be able to adjust his status a number of years from the time of his deportation does not significantly diminish the hardship he would suffer if deported. Here, for example, the petitioners contend that it could take up to ten years for Gutierrez to adjust her status through her lawful resident brother and several more years for David and Maria to adjust through her. If this is true, we cannot fathom how the possibility of obtaining adjustments of status a decade or more from now could possibly weigh against their claim of extreme hardship. On remand, the BIA should realistically assess the efficacy of the alternative means of adjustment of status before considering whether this factor weighs against or in favor of extreme hardship, and how much weight to give it
 
 
 [7]
 Unlike their claims to asylum and withholding of deportation, David and Maria's claims to suspension of deportation are not derivative of their mother's claim. They each filed applications for suspension of deportation, the merits of which do not stand entirely on the merits of their mother's application
 
 
 [8]
 The statute commits the definition of "extreme hardship" to the Attorney General, who may construe the term narrowly. Hassan v. INS, 927 F.2d 465, 467 (9th Cir.1991). The Board has, however, enumerated various factors to be considered in evaluating a claim of extreme hardship. These include the age and health of the alien; family ties in the United States and abroad; length of residence in the United States; economic and political conditions in the country to which the alien is to be deported; financial status; possibility of other means of adjustment of status; special assistance to the United States or the community; immigration history; and position in the community. In re Anderson, 16 I. & N. Dec. 596, 597-98 (BIA 1978). Moreover, as the BIA has recently stated, "This list was not meant to preclude consideration of aspects of hardship which do not fit squarely within one of these nine factors." In re O-J-O, 1996 WL 393504, at 3 (BIA June 14, 1996)
 
 
 [9]
 As the BIA has recognized, "Conditions in an alien's homeland are relevant in determining hardship...." In re Anderson, 16 I. & N. 596, 598 (BIA 1978). Although the economic detriment an alien would suffer may not be sufficient to establish extreme hardship, it should nonetheless be considered in combination with other relevant factors, for "when other factors such as advanced age, severe illness, family ties, etc. [,] combine with economic detriment to make deportation extremely hard on the alien or the citizen or permanent resident members of his family ... Congress has authorized suspension of the deportation order." Id.; see also In re Ige, 20 I. & N. 880, 882 (BIA 1994) ("Relevant factors, though not extreme in themselves, must be considered in the aggregate in determining whether extreme hardship exists.")
 
 
 [10]
 The petitioners submitted various newspaper articles describing the economic crisis in Nicaragua. A recent opinion by the BIA confirms the severity of the crisis. See In re O-J-O, 1996 WL 393504, at 5 (BIA June 14, 1996) ("The Department of State's January 1995 Country Profile for Nicaragua ... indicates that '[u]nemployment and underemployment total about 50 percent[.]' ... The economy continues to stagnate with annual per capita income 'less than one-third of what it was in the mid-1970s.' ") (citations omitted)
 
 
 [11]
 At the time of the motion to reopen, David, who had come to the United States when he was thirteen years old, was nineteen, and Maria, who had come when she was eight, was fifteen. David was in college at the time of the motion, while Maria was in high school. They claimed that deportation would be "especially severe," because they have been raised and educated in this country. As we explain more fully below, both David and Maria appear to have been significantly integrated into American society
 
 
 [12]
 The BIA must accept as true the statements in an alien's affidavits unless they are "inherently unbelievable." Aviles-Torres v. INS, 790 F.2d 1433, 1435 (9th Cir.1986). Here, the BIA did not suggest that David and Maria's claims suffered from that vice
 
 
 [1]
 Additionally, four Board members dissented from the opinion